1
2
3
4
5
6
7

8                  UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   PAUL A. HINOJOSA,                    No.  2:13-cv-1188 JAM KJN P

12              Petitioner,

13        v.                              FINDINGS & RECOMMENDATIONS

14   CONNIE GIPSON,

15              Respondent.

16

17   I.  Introduction

18        Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of

19   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 2010 conviction on

20   multiple counts of kidnapping, one count of carjacking, three counts of felony child

21   endangerment, and other charges.  Petitioner claims that there was insufficient evidence of

22   "circumstances likely to produce child endangerment," and that the prosecution misstated the

23   concept of reasonable doubt during her rebuttal argument.  After careful review of the record, this

24   court concludes that the petition should be denied.

25   II.  Procedural History

26        On March 15, 2010, a jury found petitioner guilty of kidnapping for the purpose of

27   robbery, kidnapping a child under age fourteen for extortion, kidnapping for extortion, carjacking

28   where a victim was under age fourteen, assault, and three counts of child endangerment.  (Clerk's

1

1   Transcript ("CT") 426-55; 616.)  The jury also found true that petitioner personally used a deadly

2   or dangerous weapon in the commission of all counts for which he was convicted, with the

3   exception of count 7 (use of weapon count).  (Id.)  The trial judge found that petitioner had served

4   two prior prison terms.  (CT 561.)

5           On July 7, 2010, petitioner was sentenced to an aggregate determinate prison term of

6   seventeen years four months, plus four consecutive indeterminate life terms with the possibility of

7   parole.  (CT 616-19.)

8           Petitioner appealed the conviction to the California Court of Appeal, Third Appellate

9   District.  (Respondent's Lodged Document ("LD") 9.)  The Court of Appeal affirmed the

10  conviction on January 25, 2013, but ordered the trial court to stay punishment on the three counts

11  of child endangerment (pursuant to California Penal Code § 654), reducing petitioner's

12  determinate prison sentence to a concurrent term of six months, and correcting the abstract of

13  judgment to reflect the seven year minimum on the four indeterminate life sentences.  (LD 12 at

14  25.)

15          Petitioner filed a petition for review in the California Supreme Court, which was denied

16  on April 10, 2013.  (LD 14.)

17          Petitioner filed the instant petition on June 11, 2013.  (ECF No. 1.)

18  III.  Facts[1]

19          In its unpublished memorandum and opinion affirming petitioner's judgment of

20  conviction on appeal, the California Court of Appeal for the Third Appellate District provided the

21  following factual summary:

22  ////

23

---

[1]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate
District in People v. Hinojosa, No. C065555 (Jan. 25, 2013), a copy of which was lodged by
respondent as Lodged Document 12 on October 3, 2013.  "Factual determinations by state courts
are presumed correct absent clear and convincing evidence to the contrary."  Miller-El v.
Cockrell, 537 U.S. 322, 340 (2003), citing 28 U.S.C. § 2254(e)(1); Taylor v. Maddox, 366 F.3d
992, 1000 (9th Cir. 2004).  Petitioner appended to the petition his appellate counsel's restatement
of the facts, but did not challenge the facts as stated by the Court of Appeal.  However, the
undersigned has independently reviewed the record, and finds this summary to be accurate.

The Prosecution Case-in-Chief

On May 2, 2009, G.S. drove his three sons, 15-year-old C.J., 13-year-old R.J., and nine-year-old M.P., to a Woodland car wash to clean the family car. While G.S. and the children were washing the car, defendant approached G.S. and requested a cigarette and money. G.S. explained that he had neither cigarettes nor money. Defendant then asked for a ride to his home on the other side of the city. G.S. refused because his children were with him and defendant would not fit in the car. After persistent requests, G.S. relented and agreed to drive defendant home because rainfall appeared to be imminent. The children seated themselves in the rear seat, while defendant seated himself in the front passenger seat. Defendant began directing G.S.'s driving.

G.S. noticed that defendant seemed abnormally nervous and fidgety. Thereafter, defendant pulled what G.S. believed to be a pistol from beneath his sweatshirt and pointed the gun at G.S.'s rib cage.

Defendant said he would shoot G.S. if he did not do exactly as told. Shocked and scared, G.S. pulled the car to the side of the road. Defendant shouted at G.S. to continue driving, and G.S. complied. G.S. asked defendant to calm down and said he would do what defendant wanted. M.P. began to cry, saying in a scared voice, "Papi, what's happening, what's happening[?]"

Defendant demanded that G.S. drive to a bank and that he withdraw $600 from his bank account. G.S. did not have money in the bank but he agreed, hoping that driving to town would provide him an opportunity to buy time and decide what to do. Defendant demanded that G.S. give him the driver's license, money, and credit cards from his wallet. Defendant said he wanted the address on G.S.'s driver's license so that, if anything happened to defendant, he could go to G.S's house and kill G.S. and his family. When G.S. asked defendant not to do this in front of the children, defendant replied, "I don't give a shit" or "I don't want to hear that shit." Defendant said he was the one with the gun and could do anything he wanted.

While G.S. drove, defendant waved the gun around, pointing it in turn at G.S. and at the children. All of the children started to cry. Defendant told G.S. to tell the children to shut up "or I'm going to kill every single little fucker." He told the children that if they were not quiet he would take them to a field and shoot them.

C.J. recalled that defendant asked the boys to give him any electronics they had. M.P. tried to sneak his cellular telephone from his pocket so that he could call 911, but defendant noticed, asked M.P. if he had a cell phone and demanded that M.P. hand it over. Instead, M.P. put the phone back in his pocket and told defendant he did not have a cell phone.

Defendant's hand trembled and he behaved in a nervous and erratic manner. G.S. thought defendant did not know what he was doing

3

and this scared G.S. He believed defendant's gun was real and capable of shooting him. When the car came to an intersection in town, G.S. asked if he could let the children out of the car. Defendant refused and explained that he was "in control of everything."

G.S.'s attention was divided between defendant and the traffic and signal lights on Main Street, and he felt his fear and nervousness interfered with his ability to safely operate the car. G.S. thought about driving to the police department, but he could not safely make a necessary turn and feared that defendant might figure out what he was trying to do. G.S. looked back and saw the children's faces and knew they were very frightened.

Ten to 12 minutes after the incident began, G.S. stopped the car at an intersection on Main Street for a red light. Defendant was looking all around. G.S. put the car in park, tried to grab defendant's gun with his left hand, and punched defendant's face with his right.

G.S. yelled to the children to run and get help. M.P. and R.J. fled from the car. C.J., who had been attempting to choke defendant's neck, fled when G.S. told him to go. The children exited the car using the passenger side door because there were cars to the left. There was also a line of cars behind them at the red light, and the boys ran in the street to the nearest motorists, asking them to call the police. The children then noticed a Ross department store and ran there.

Inside the car, G.S. and defendant continued to struggle over the gun. Using the butt of the gun, defendant repeatedly hit G.S. in the face, causing several swollen and red areas and giving G.S. a headache that persisted for several days. Suddenly, the gun broke into two pieces, cutting G.S.'s finger in the process. G.S. stopped fighting for the broken gun, and defendant fled from the car, still holding onto the gun. G.S. then ran in the direction he had last seen the children, leaving the car behind. There were 10 cars behind him honking, but he was focused on trying to get to his kids. A few minutes later, he was reunited with the children at the shopping center.

Defendant fled through the shopping center to a restaurant where he previously had been employed. After former coworkers refused his requests for a ride, defendant fled to a nearby residential area. He entered a family residence and requested assistance, saying he was running from the police because he had attempted to rob someone. Instead of helping defendant, the family called the police. When defendant tried to run, a family member tackled him and put him in a choke hold. The police arrived shortly thereafter and arrested defendant.

The arresting officers noted that defendant matched the broadcast description of the kidnapping and robbery suspect. An officer asked defendant what he had done with the gun. Initially, defendant denied having a gun; then he claimed to have had only a screwdriver. He eventually admitted having a gun. He then led the

officers to the gun where he had hidden it at the restaurant. The weapon, a broken pellet gun, was not loaded with pellets or an air cartridge.

During the abduction, G.S. feared that defendant would shoot the children.

M.P. was really scared during the incident. He wanted to get out of the car, but thought he would be shot. M.P. had nightmares for several days after the incident, and for two months afterwards, M.P. could not sleep by himself. When the family drove past the area where the kidnapping had occurred, M.P. would look down or close his eyes and become visibly frightened.

During the incident, R.J. felt as if he were going into shock. His body was frozen and his vision went black and white. His heart was beating very fast and he was thinking he did not want this to be the last day of his life.

C.J. testified that he was terrified during the incident and did not know what to do. The entire time they were in the car, he was scared of being shot. C.J. thought about jumping out of the car, but he did not want to leave his brothers.

(People v. Hinojosa, slip op. at *1-3.)

IV.  Standards for a Writ of Habeas Corpus

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003), overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63 (2003).  Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

1    28 U.S.C. § 2254(d).

2          Under section 2254(d)(1), a state court decision is "contrary to" clearly established United

3    States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in

4    Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a

5    decision of the  Supreme Court and nevertheless arrives at a different result.  Early v. Packer, 537

6    U.S. 3, 7 (2002) (citation omitted).

7          Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court

8    may grant the writ if the state court identifies the correct governing legal principle from the

9    Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

10   case.  Williams v. Taylor, 529 U.S. 362, 413 (2000).  A federal habeas court "may not issue the

11   writ simply because that court concludes in its independent judgment that the relevant state-court

12   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

13   application must also be unreasonable."  Id. at 412; see also Lockyer, 538 U.S. at 75 (it is "not

14   enough that a federal habeas court, in its independent review of the legal question, is left with a

15   'firm conviction' that the state court was 'erroneous.'") (internal citations omitted).  "A state

16   court's determination that a claim lacks merit precludes federal habeas relief so long as

17   'fairminded jurists could disagree' on the correctness of the state court's decision."  Harrington v.

18   Richter, 131 S. Ct. 770, 786 (2011).

19         The court looks to the last reasoned state court decision as the basis for the state court

20   judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  If there is no reasoned decision,

21   "and the state court has denied relief, it may be presumed that the state court adjudicated the

22   claim on the merits in the absence of any indication or state-law procedural principles to the

23   contrary."  Harrington, 131 S. Ct. at 784-85.  That presumption may be overcome by a showing

24   that "there is reason to think some other explanation for the state court's decision is more likely."

25   Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

26         "When a state court rejects a federal claim without expressly addressing that claim, a

27   federal habeas court must presume that the federal claim was adjudicated on the merits – but that

28   presumption can in some limited circumstances be rebutted."  Johnson v. Williams, 133 S. Ct.

6

1088, 1096 (Feb. 20, 2013).  "When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de novo review of the claim.  Johnson, 133 S. Ct. at 1097.

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, the federal court conducts an independent review of the record.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  Where no reasoned decision is available, the habeas petitioner has the burden of "showing there was no reasonable basis for the state court to deny relief."  Harrington, 131 S. Ct. at 784.  "[A] habeas court must determine what arguments or theories supported or, . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id. at 786.

V.  Petitioner's Claims

A.  Child Endangerment

Petitioner claims that there was insufficient evidence of "circumstances likely to produce death or great bodily harm" to support his conviction on three counts of felony child endangerment.

The last reasoned rejection of petitioner's insufficient evidence claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed this claim as follows:

> Defendant contends the child endangerment counts must be reversed because there was insufficient evidence of "circumstances likely to produce death or great bodily harm."  We disagree.
>
> "On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt.  [Citations.]  Evidence meeting this standard satisfies constitutional due process and reliability concerns. [Citations.]  [¶]  While the appellate court must determine that the supporting evidence is reasonable, inherently credible, and

of solid value, the court must review the evidence in the light most favorable to the prosecution, and must presume every fact the jury could reasonably have deduced from the evidence.   [Citations.]   Issues of witness credibility are for the jury.  [Citations.]"  (*People v. Boyer* (2006) 38 Cal.4th 412, 479-480.)

Section 273a, subdivision (a), provides:   "Any person who, *under circumstances or conditions likely to produce great bodily harm or death*, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years."  (Italics added.)  The prosecution proceeded on the second branch of this omnibus statute, asserting that defendant willfully inflicted unjustifiable mental suffering on the boys.FN4

FN4. Section 273a, subdivision (a) is an omnibus statute that proscribes essentially four branches of conduct: (1) willfully causing or permitting a child to suffer, or (2) inflicting unjustifiable physical pain or mental suffering on a child, or (3) having the care or custody of any child, willfully causing or permitting the person or health of a child to be injured, or (4) having the care or custody of any child, willfully causing or permitting a child to be placed in such situation that its person or health is endangered.  (*People v. Sargent* (1999) 19 Cal.4th 1206, 1215 (*Sargent*).)

"It is for the trier of fact to determine whether the act was done 'under circumstances or conditions likely to produce great bodily harm or death [.]' [Citations.]"  (*Sargent, supra*, 19 Cal.4th at p. 1223.)  "[T]he word 'likely' . . . means ' "the probability of serious injury is great." ' "  (*People v. Chaffin* (2009) 173 Cal.App.4th 1348, 1352.) FN5  " '[T]here is no requirement that the actual result be great bodily injury.' "  (*Sargent, supra*, 19 Cal.4th at p. 1216.)

FN5. We use this definition of "likely to produce great bodily injury or death" for purposes of our analysis and, therefore, need not further address defendant's contention that the definition in *People v. Wilson* (2006) 138 Cal.App.4th 1197, 1204 is erroneous. We note that the instruction provided the jury here did not include a definition.  In October 2010, CALCRIM No. 821 was modified to provide a definition. It reads in pertinent part:  "The phrase likely to produce (great bodily harm / [or] death) means the probability of (great bodily harm / [or] death) is high."  Defendant does not assert instructional error, so we need not address sufficiency of the instruction.

Looking at the evidence in the light most favorable to the judgment, we conclude that a rational jury could have determined that the probability of serious injury was great from the totality of the volatile circumstances and other conditions here.   G.S., the children's father and the driver of the car, had what he thought was a firearm aimed at his chest and his children were highly upset.  He

was distracted while driving and felt his nervousness interfered with his ability to operate the vehicle safely. They were traveling on city streets with other vehicles.   Under these circumstances and conditions, the likelihood of a collision causing injury or death to the children was high.   Moreover, given the circumstances, the likelihood of resistance by the distracted G.S. could have resulted in a collision.  The children could have jumped from the moving car in desperation and been injured, or they could have joined their father in fighting with defendant.  When the opportunity presented itself, while they were stopped at the red light, the children left the car by running into the street, where they could have been struck by a vehicle in traffic.  A myriad of seriously injurious outcomes were probable on these frightening facts, and it seems miraculous that something more serious did not happen.

Indeed, such circumstances illustrate the reason why before kidnapping was made a statutory basis for first degree felony murder, courts had recognized kidnapping to be an *inherently dangerous felony* for purposes of second degree felony murder.  An "inherently dangerous felony" for purpose of the second degree felony murder doctrine "is 'an offense carrying "a high probability" that death will result.' "   (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 377.) In *People v. Pearch* (1991) 229 Cal.App.3d 1282, a murder case involving simple kidnapping, the court observed, "Threats of serious harm or death made with a show of willingness to carry through on those threats present an inherently dangerous situation."  (*Pearch, supra*, 229 Cal.App.3d at p. 1298.) In *People v. Ordonez* (1991) 226 Cal.App.3d 1207, 1228, the court held, "kidnapping for ransom, extortion or reward [citation] is an offense carrying 'a high probability' that death will result.   It therefore is an offense inherently dangerous to human life, and supports a conviction for second degree felony murder."

Defendant contends that the circumstances of the incident as it actually occurred were not likely to produce great bodily harm or death.  He points out that G.S. did not violate any traffic laws or come close to causing any collisions.  As we have noted, there is no requirement that actual injury result.   Likewise, there is no requirement that the "actual result" be erratic driving, a collision, an escape from a moving car, or a fight with defendant.  The element of the crime at issue is the infliction of mental suffering "under circumstances and conditions *likely to produce* great bodily harm or death," not circumstances and conditions which *actually produce great* bodily injury or death.   Setting aside the inherent dangerousness and high probability of death associated with kidnapping, and looking at the evidence here in a light most favorable to the prosecution, a jury could reasonably find that the circumstances and conditions we described above were likely to produce great bodily harm or death.   The child endangerment counts are supported by substantial evidence.

(*People v. Hinojosa*, slip op. at *3-*5.)

////

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). "[E]vidence is sufficient to support a conviction if, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Coleman v. Johnson, 132 S. Ct. 2060, 2064 (2012), quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979). "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318). In other words, "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 132 S. Ct. 2, 4 (2011).

In conducting federal habeas review of a claim of insufficient evidence, "all evidence must be considered in the light most favorable to the prosecution." Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011). "Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial," and it requires only that they draw "'reasonable inferences from basic facts to ultimate facts.'" Coleman, 132 S. Ct. at 2064 (citation omitted). "'Circumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.'" Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995) (citation omitted).

"A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In order to grant relief, the federal habeas court must find that the decision of the state court rejecting an insufficiency of the evidence claim reflected an objectively unreasonable application of Jackson and Winship to the facts of the case. Ngo, 651 F.3d at 1115; Juan H., 408 F.3d at 1275 & n.13. Therefore, when a federal habeas court assesses a sufficiency of the evidence challenge to a state court conviction under AEDPA, "there is a double dose of deference that can rarely be surmounted." Boyer v. Belleque, 659 F.3d 957, 964 (9th Cir. 2011). The federal habeas court determines sufficiency of the

////

1   evidence in reference to the substantive elements of the criminal offense as defined by state law.

2   Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

3        Under California law, Penal Code section 273a[2] is intended to protect children from

4   "circumstances or conditions likely to produce great bodily harm or death."  People v. Chaffin,

5   173 Cal.App.4th 1348, 1351 (2009).  "Case law has long recognized that the phrase 'likely to

6   produce great bodily harm or death' in section 273a means "'the probability of serious injury is

7   great.'"[3]  Chaffin, 173 Cal.App.4th at 1352 (citation omitted).  There is no requirement that the

8   act actually result in great bodily injury.  Sargent, 19 Cal.4th at 1216.

9        Petitioner claims there was insufficient evidence to support the child endangerment counts

10  because the weapon petitioner was holding was an inoperable and unloaded BB gun.  (ECF No. 1

11  at 22.)  Despite G.S.'s testimony that he felt distracted while driving during the incident

12  (Reporter's Transcript ("RT") 170), G.S. also testified that he did not speed, did not come close to

13  having an accident, safely turned onto the county road and then Main Street, did not violate any

14  traffic laws, and appropriately stopped at the stoplight at Matmor Street.  (ECF No. 1 at 22, citing

15  RT 213-15.)  Without evidence that petitioner caused G.S. to drive recklessly or carelessly,

16  petitioner contends there is no evidentiary basis for a finding that the boys in the backseat were

17  ever at substantial risk of being seriously injured or killed in an accident.  (ECF No. 1 at 22.)

18  Petitioner argues that no evidence was presented that an accident was likely or probable, and

19  notes that the boys were in the back seat wearing seatbelts (RT 200), thus diminishing their likely

20  injury had an accident occurred.  (ECF No. 1 at 22.)  Petitioner contends that the prosecution's

21

22  [2]  Section 273a, subdivision (a) is an omnibus statute that proscribes essentially four branches of
    conduct:  (1) willfully causes or permits any child to suffer, or (2) inflicts thereon unjustifiable

23  physical pain or mental suffering, or (3) having the care or custody of any child, willfully causes
    or permits the person or health of such child to be injured, or (4) willfully causes or permits such

24  child to be placed in such situation that its person or health is endangered.  Sargent, 19 Cal.4th at
    1215.

25

26  [3]  As noted by the state appellate court, jury instruction CALCRIM 821 was modified in October
    of 2010 to provide the following definition:  "The phrase likely to produce (great bodily harm/[or]

27  death) means the probability of (great bodily harm/[or] death) is high."  Id.  The jury instruction
    in petitioner's trial did not include a definition.  (Reporter's Transcript 633-34; 656-57.)

28

1    arguments concerning what "could have happened" was rank speculation, rising only to the level

2    of possibility rather than probability as required under § 273a.  (ECF No. 1 at 22-23.)  In his

3    traverse,[4] petitioner argues that he "did nothing to the kids," and the "kids were never restrained

4    in any way."  (ECF No. 21 at 2; 3.)  Petitioner also contends that despite the kids testifying that

5    they told the officer they saw the gun, petitioner points out that the officer testified that the kids

6    told him that they did not see the gun.  (ECF No. 21 at 2.)

7         Respondent counters that petitioner fails to explain how the state court's denial of this

8    claim is contrary to or an unreasonable application of Jackson.  (ECF No. 17 at 17.)  Respondent

9    contends that the state court correctly viewed the circumstances as a whole, rather than limiting

10   their review to petitioner's possession of a pellet gun, noting petitioner committed a carjacking

11   while threatening the family with the gun, which they believed to be a firearm.  Moreover, the

12   state court relied on California case law which holds that kidnapping, and kidnapping for

13   extortion, are both inherently dangerous felonies, creating a dangerous situation.  Respondent

14   argues that petitioner's attempt to challenge the legal significance of the facts is inappropriate on

15   habeas review.  (ECF No. 17 at 18, citing Bradsaw v. Richey, 546 U.S. 74, 76 (2005).)

16        The California Court of Appeal considered petitioner's arguments and rejected them,

17   finding "that a rational jury could have determined that the probability of serious injury was great

18   from the totality of the volatile circumstances and other conditions here."  Hinojosa, slip op. at 8.

19   The father of the children, who was the driver of the car, had what he thought was a firearm

20   aimed at his chest, and his children were highly upset.  G.S. testified that petitioner took out a

21   pistol and pointed it at him and told G.S. that he should do what petitioner told him to, "otherwise

22   [petitioner] would shoot [him.]"  (RT 138, 139.)  Petitioner was shouting at G.S., and G.S.'s

23

24   ──────────────
     [4]  In his traverse, petitioner also contends that he did not commit the aggravated charge of kidnap
25   for ransom, and appears to argue that his kidnapping for extortion conviction should be reversed
     because the asportation was only for a short distance, there was no secret location of any one
26   person, and there was no substantial increase in risk of harm beyond that of robbery.  (ECF No.
     21 at 3, 5-6.)  However, because petitioner did not raise this claim in the petition, the undersigned
27   declines to address it.  Cf. Delgadillo v. Woodford, 527 F.3d 919, 930 n.4 (9th Cir. 2008)
     (holding that traverse is not proper pleading to raise additional ground for relief or amend
28   petition); Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) (same).

youngest son began to cry.  (RT 140-42.)  G.S. testified that he was nervous with petitioner in the car and that G.S. "wasn't keeping attention while [he] was driving."  (RT 170.)  At the stoplight, G.S. stopped the car, tried to grab the gun and began fighting with petitioner.  (RT 176.)  G.S. told his kids to get out of the car, while he tried to "save his kids" by attempting to get the gun away from petitioner.  (RT 176.)  It wasn't until the gun broke in two during the fight that G.S. realized the gun wasn't real.  (RT 182.)  G.S. testified that petitioner told G.S. that petitioner wanted to take G.S.'s wallet in case something happened, petitioner would go to G.S.'s house and kill G.S. or "do something."  (RT 188.)  G.S. testified he was "just a little scared" because "what if this guy doesn't get caught, he's going to go to [G.S.'s] house and do something."  (RT 189.)

The children who were in the car with G.S. each took the stand and testified as to their recollections of what happened.  R.J. testified that he could see petitioner pointing the gun at G.S. (RT 256-58.)  R.J. said that petitioner was demanding money, and that he wanted to get out of the car.  (RT 258.)  R.J. testified that he was in shock; his heart was beating fast, and he thought, "I don't want this to be the last day to live."  (RT 263.)  When G.S. told the children to get out of the car, R.J. exited on the opposite side of the car because there were cars on his side of their car. (RT 261.)  C.J. identified petitioner in the courtroom.  (RT 292.)  C.J. testified that he saw the tip of petitioner's gun, and that C.J. was "terrified" and "scared."  (RT 294; 297.)  C.J. testified that G.S. was terrified because his voice sounded like it was "kind of crying-ish."  (RT 297.)  C.J. said that M.P. was crying a little.  (RT 297, 321.)  C.J. was "feeling scared."  (RT 304.)  M.P. testified that what happened "scared" him, that he was "really scared."  (RT 333; 343.)  M.P. said that G.S.'s "voice sounded scared."  (RT 345.)

Amanda Waldeck, the Woodland Police Department patrol officer who first appeared on the scene testified that her interview with R.J. was only about three minutes long because "he wasn't providing -- he wasn't answering questions.  He was just staring at me."  (RT 533.) Similarly, her interview with C.J. was about three minutes long because "he was just -- had a blank stare and wasn't answering my questions."  (RT 533.)  Officer Waldeck testified that M.P. was "visibly shaking and looking down at the ground and just would not answer questions. . . . he was stuttering and just could not talk to me."  (RT 533-34.)  Officer Waldeck testified that G.S.'s

1    demeanor was "very fidgety and paranoid almost just looking side to side, talking very quickly.

2    He just appeared very nervous," and stayed that way throughout most of the interview.  (RT 560.)

3    During her first interview of G.S., he told her that petitioner yelled at him and said "something to

4    the effect of 'I will shoot you and your kids,' and 'keep driving.'"  (RT 563.)  G.S. also told her

5    that petitioner had "waived the gun" "to the children," and G.S. "while he was making that

6    statement."  (RT 564.)  In her second interview of G.S., G.S. told her that petitioner told G.S. that

7    "if anything happens to me, I will go to your house and kill every motherfucker in your house."

8    (RT 564.)

9         Thomas Roach testified that he witnessed the three young boys running toward the Ross

10   Department Store, and the boys "were crying," "sobbing," "really crying" -- "Those little boys

11   were very scared."  (RT 370; 371.)  When he asked the boys what was wrong, his understanding

12   was that more than one of them told him they thought their father had been shot.  (RT 371; 385.)

13   Defense counsel objected to this testimony as hearsay, and the trial court admitted the testimony

14   for a limited purpose, not for the truth of what was stated, but as to the little boys' state of mind.

15   (RT 371.)

16        Thus, viewing the evidence in the light most favorable to the prosecution, there was

17   sufficient evidence from which a jury could find that petitioner endangered the children.  See

18   Jackson, 443 U.S. at 319.  As the Court of Appeal found, G.S. thought petitioner was holding a

19   firearm to G.S.'s chest; G.S. was distracted and thought his nervousness interfered with his ability

20   to safely drive the car.  G.S.'s children were highly upset, and R.J. testified that he wanted to get

21   out of the car.  G.S. was driving on city streets with other cars.  The child endangerment counts

22   are supported by substantial evidence.  In any event, the undersigned cannot conclude that the

23   state court's decision reflected an unreasonable application of Jackson and Winship to the facts of

24   this case, or that such decision was contrary to, or involved an unreasonable application of,

25   clearly established federal law, as determined by the United States Supreme Court.  Thus, habeas

26   relief is not warranted on this claim.

27   ////

28   ////

14

B. <u>Prosecutor's Comment on Reasonable Doubt</u>

Petitioner claims that the prosecution misstated the law by suggesting that reasonable doubt was simply an "abiding conviction," and then explained that this just meant jurors would continue to "feel good" about their decision after rendering the verdict, and that it was not "a decision like who you're going to marry." (ECF No. 1 at 25.)  Petitioner argues that this misconduct was exacerbated when the trial court overruled one of defense counsel's objections.

Respondent counters that petitioner's claim is barred from federal habeas rule pursuant to California's contemporaneous objection rule because defense counsel did not object to the prosecution's comment about marriage at trial.  But nevertheless, respondent argues that the jury instructions, taken as a whole, demonstrate that the jurors did not give the prosecutor's arguments the same significance as the evidence in the case. (ECF No. 17 at 23.)  Moreover, because the state court reasonably found the evidence against petitioner was overwhelming, respondent argues there is no basis for this court to disagree with the state court's conclusion.  (ECF No. 17 at 23-24.)

The last reasoned rejection of petitioner's juror misconduct claim is the decision of the California Court of Appeal for the Third Appellate District on petitioner's direct appeal.  The state court addressed this claim as follows:

> Defendant contends the prosecutor's misstatement of reasonable doubt during her rebuttal argument, coupled with the trial court's overruling of a defense objection to the argument, was error requiring reversal. We disagree.
>
> A. Background
>
> During closing argument, defense counsel argued the following: "The decisions you make are not going to have to last for a day, a week, or a month.  The decisions you make about the law and the evidence and the facts in this trial is [sic] going to have to last with you for the rest of your lives.  That is how important the decisions you are going to have to make [sic].  It's a very difficult position to be sitting in the judgment of another.  [¶]  And to give you a little bit more of an idea as to how -- how certain you have to be in regards to your decisions, we used to be able to argue that this decision that you make is as important as who you choose to marry.  [¶]  We can't make that argument anymore because the divorce rates now are roughly about fifty percent, so if you think about it, it's really kind of a mindblower in that the decisions that you make in this trial are more important than the decision that you've made

15

on who you wanted to spend the rest of your life with.  [¶]  That is how important these decisions are.  That is how important you have to be certain as to the decisions that you actually make.  [Sic.]"

The prosecutor responded to defense counsel's argument in rebuttal.  The following argument, objections and rulings took place at that time:

"[THE PROSECUTOR]:  The last thing I want to talk to you a little is about reasonable doubt.  [Defense counsel] kind of makes this sound like a huge mountain that is totally unattainable, but that's not the case.  [¶]  Proof beyond a reasonable doubt is the standard that is used in criminal cases in every courtroom across the nation every single day.  It's used in DUI cases.  It's used in murder cases.  It is the same standard, and it is attained by -- jurors find proof beyond a reasonable doubt in cases all the time.  [¶]  It's not unreachable, and it's not illusive [sic].  I mean, all it is an abiding conviction.  It's just, you know, the proof is enough to show you that he did it, and tomorrow when you wake up if you think he did it, that's an abiding conviction.  [¶]  When you think about -- when you are finally done with this case and are able to go home and talk to your friends and family about it, because I'm sure they've all been dieing [sic] to know what is this case about and you have to tell them I can't -- I can't tell you, but think about what you wanted to tell them.  [¶]  When you are finally able to and you've been released from the case and your verdict is in and you're finally able to tell them about what this case is all about, do you want to say 'gosh, I sat on this trial where this man and these kids were kidnapped, and this man tried to rob them, and he had a gun.  It wasn't a real gun, but they thought it was.'  I mean, if that's how you're going to describe the case and that's how you've been thinking in your head when your friends and family have asked you what's going on, that's how you've been wanting to talk about it, that's proof beyond a reasonable doubt.

"[DEFENSE COUNSEL]:  Objection.

"THE COURT:  Sustained.

"[DEFENSE COUNSEL]:  Move to strike.

"THE COURT:   The last statement will be stricken.  [¶]  The instruction on reasonable doubt is contained.  [Sic.]  Both attorneys have argued what it is, and the instruction is in your packet about what reasonable doubt is and what the People's burden of proof is."

The prosecutor then continued her rebuttal argument.

"[THE PROSECUTOR]:   If you -- an abiding conviction just means you feel good about the decision you've made.  Tomorrow when you wake up, you feel good about the decision you made, you feel like you've made the right choice.

"[DEFENSE COUNSEL]:  "Objection, Your Honor.  Misstatement of the law.

"THE COURT:  "Overruled.  She can continue."

The prosecutor then continued.

"[THE PROSECUTOR]:  "And the week after, you feel good about the decision you made, and the week after, and the month after, and so on and so forth.  I mean, don't -- well . . . [¶]  The point is that it is really not so high of a standard that you can't reach it.  Okay.  An abiding conviction is not, you know, it's not a decision like who you're going to marry.  Okay.  It -- I'm just I'll leave you with this:  That the evidence in this case has proved beyond a reasonable doubt that the defendant committed these crimes."

No objection was made to the prosecutor's comment about marriage.

B. Analysis

"'The applicable federal and state standards regarding prosecutorial misconduct are well established.  ""A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.""" [Citations.]  Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves """"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.""" [Citation.]' [Citation.]"  (*People v. Hill* (1998) 17 Cal.4th 800, 819 (*Hill*).)

A prosecutor commits misconduct when he misrepresents the standard of proof or trivializes the quantum of evidence required to meet the standard of proof.  (*Hill, supra,* 17 Cal.4th at pp. 828–829.)  "When the claim focuses on the prosecutor's comments to the jury, we determine whether there was a reasonable likelihood that the jury construed or applied any of the remarks in an objectionable fashion."  (*People v. Booker* (2011) 51 Cal.4th 141, 184-185 (*Booker*); *People v. Pierce* (2009) 172 Cal.App.4th 567, 572 (*Pierce*).)

Defendant made two timely objections to the prosecutor's argument. The trial court sustained defendant's first objection to the prosecutor's remarks, ordered the comments stricken, and admonished the jury. Defendant does not seek reversal based on those comments. Defendant claims reversible error based on the comments preceding the second objection, which was expressly grounded on "[m]isstatement of the law," and the court's decision to overrule that objection, as well as the comments the prosecutor made thereafter.

Defendant contends that the prosecution's comment that "an abiding conviction just means you feel good about the decision you've made," was a misstatement of law because it impermissibly reduced the prosecution's burden of proof to a mere duty to persuade jurors to make a decision about which they felt good. In

context, we do not see it that way.  The prosecutor's remarks before and after the objection make plain that she was not equating her burden of proof with the creation of good feelings but was illustrating the temporal nature of the term "abiding."

The prosecutor argued "an abiding conviction just means you feel good about the decision you've made.  *Tomorrow when you wake up*, you feel good about the decision you made, you feel like you've made the right choice.  [¶] . . . [¶]  *And the week after*, you feel good about the decision you made, *and the week after, and the month after, and so on and so forth.*"  (Italics added.)  This argument was responsive to and consistent with defense counsel's argument that the "decisions you make about the law and the evidence and the facts in this trial is [sic ] going to have to last with you for the rest of your lives."  The prosecutor's comments evoked and focused on the concept of permanence.  (See *Pierce, supra*, 172 Cal.App.4th at pp. 573-574 [no reasonable likelihood that jury was misled by prosecutor's remarks evoking permanence].)

The trial court did not err by overruling the defense objection to the prosecutor's argument.  There is not a reasonable likelihood the jury construed or applied the prosecutor's remarks in an objectionable fashion.  (*Booker, supra*, 51 Cal.4th at pp. 184-185.)  No reasonable juror would have understood the prosecutor's argument to mean that, contrary to the court's instructions, "'all' proof beyond a reasonable doubt means is that jurors would wake up and 'feel good' about their decision."  The prosecutor's argument was neither deceptive nor reprehensible, and it did not constitute misconduct.  (*Hill, supra*, 17 Cal.4th at p. 819.)

Defendant contends the prosecutor's statement -- made after trial counsel's second objection -- that an abiding conviction is not like deciding who to marry was improper.  No objection was made to this comment.  Because a timely objection and admonishment would have cured any harm engendered by the argument, any challenge to those portions is forfeited on appeal.  (*People v. Martinez* (2010) 47 Cal.4th 911, 956.)

Defendant contends any objection at that point would have been futile because the court had just overruled defendant's misstatement of law objection.  (*Hill, supra*, 17 Cal.4th at p. 820.)  But the court, just moments before, had also sustained defendant's first objection.  And in ruling on the second objection, the court merely permitted the prosecutor to continue based upon what she had said up to that point.  That ruling did not signal that an objection to what might be said thereafter would not be sustained.  Defendant has not established futility.

Finally, we conclude the prosecutor's comment was not prejudicial, even under a standard of beyond a reasonable doubt.  The evidence was overwhelming.  (See *Booker, supra*, 51 Cal.4th at p. 186 [jury properly instructed on the prosecution's burden of proof and evidence of defendant's guilt was overwhelming]; *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1264, 1268-1269 [prosecutor's use of puzzle picture of the Statue of Liberty with

missing pieces to illustrate reasonable doubt was misconduct, but the error was harmless, in part, because of the strength of the evidence].)

We reject the assertion made by the defense at oral argument that our high court's decision in *People v. Aranda* (2012) 55 Cal.4th 342 (*Aranda*) suggests a reviewing court cannot consider the strength of the prosecution's case in evaluating whether the error was harmless in this context. In *Aranda*, the court discussed the application of the *Chapman* standard to assess the effect of the erroneous omission of the standard reasonable doubt instruction. (*Aranda, supra*, 55 Cal.4th at pp. 367-374.) Contrasting the issue in *Aranda*, the court noted that when employing the *Chapman* harmless error test, a reviewing court normally "looks to the 'whole record' to evaluate the error's effect on the jury's verdict. [Citation]." (*Aranda, supra*, 55 Cal.4th at p. 367.) "[T]he effect of such an error is assessed by asking whether there is a reasonable possibility that the verdict in question was not based upon a finding of guilt beyond a reasonable doubt. If, after examination of the record, the reviewing court concludes beyond a reasonable doubt that the jury must have found the defendant's guilt beyond a reasonable doubt, the error is harmless. If, on the other hand, the reviewing court cannot draw this conclusion, reversal is required." (*Ibid.*)

Our high court went on to note that the harmless error analysis is different when the trial court omits instruction on reasonable doubt. "No matter how overwhelming a court may view the strength of the evidence of the defendant's guilt, that factor is not a proper consideration on which to conclude that *the erroneous omission of the standard reasonable doubt instruction was harmless under Chapman*." [¶] [A] reviewing court applying the *Chapman* standard to *determine the prejudicial effect of the erroneous omission of the standard reasonable doubt instruction* should evaluate the record as a whole -- but not rely upon its view of the overwhelming weight of the evidence supporting the verdict -- to assess how the trial court's failure to satisfy its constitutional obligation to instruct on the prosecution's burden of proof beyond a reasonable doubt affected the jury's determination of guilt. If it can be said beyond a reasonable doubt that the jury must have found the defendant's guilt beyond a reasonable doubt, the error is harmless. If the reviewing court cannot draw this conclusion, reversal is required." (*Aranda, supra*, 55 Cal.4th at p. 368, italics added.)

Here, unlike in *Aranda*, the trial court properly instructed on reasonable doubt. The trial court read the standard reasonable doubt instruction during the preliminary instructions. It reread the instruction as part of the predeliberation instructions. And the trial court reinforced the primacy of that instruction after sustaining defendant's first objection to the prosecutor's closing argument. *Aranda* does not help defendant here.

The evidence showing that defendant kidnapped and terrorized a father and his young sons for the purpose of obtaining money from the father was overwhelming. Considering the "whole record,"

1                    including the overwhelming evidence of guilt, we conclude that

2                    even if the prosecutor's argument was misconduct, any error was
                   harmless beyond a reasonable doubt.

3 (People v. Hinojosa, slip op. at 8-12.)

4      A criminal defendant's due process rights are violated when a prosecutor's misconduct

5 renders a trial fundamentally unfair.  Parker v. Matthews, 132 S. Ct. 2148, 2153 (2012) (per

6 curiam); Darden v. Wainwright, 477 U.S. 168, 181 (1986); Comer v. Schriro, 480 F.3d 960. 988

7 (9th Cir. 2007).  Claims of prosecutorial misconduct are reviewed "'on the merits, examining the

8 entire proceedings to determine whether the prosecutor's [actions] so infected the trial with

9 unfairness as to make the resulting conviction a denial of due process.'"  Johnson v. Sublett, 63

10 F.3d 926, 929 (9th Cir. 1995) (citation omitted).  See also Greer v. Miller, 483 U.S. 756, 765

11 (1987); Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974); Towery v. Schriro, 641 F.3d 300,

12 306 (9th Cir. 2010).  Relief on such claims is limited to cases in which the petitioner can establish

13 that prosecutorial misconduct resulted in actual prejudice.  Darden, 477 U.S. at 181-83.  See also

14 Towery, 641 F.3d at 307 ("When a state court has found a constitutional error to be harmless

15 beyond a reasonable doubt, a federal court may not grant habeas relief unless the state court's

16 determination is objectively unreasonable").  Prosecutorial misconduct violates due process when

17 it has a substantial and injurious effect or influence in determining the jury's verdict.  See Ortiz-

18 Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).

19      Procedural Default

20      As set forth above, the California Court of Appeal concluded that petitioner forfeited this

21 claim of prosecutorial misconduct by failing to object to the prosecutor's reference to the decision

22 to marry during rebuttal argument at trial.  Respondent argues that petitioner's claim of

23 prosecutorial misconduct is procedurally barred by the contemporaneous objection rule.

24      When a state court's rejection of a federal claim is based on a violation of a state

25 procedural rule that is adequate to support the judgment and independent of federal law, a habeas

26 petitioner has procedurally defaulted his claim.  Coleman v. Thompson, 501 U.S. 722, 729-30

27 (1991).  A state procedural rule is adequate if it has been "well-established and consistently

28 applied."  Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir. 2003).  The procedural rule is

1    independent if it is not "interwoven with the federal law."  LaCrosse v. Kernan, 244 F.3d 702,

2    704 (9th Cir. 2001).  The Ninth Circuit has found this state procedural rule to be an adequate and

3    independent bar to federal habeas review.  See Paulino v. Castro, 371 F.3d 1083, 1093 (9th Cir.

4    2004); Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002); Vansickel v. White, 166 F.3d

5    953, 957-58 (9th Cir. 1999).  If a state procedural ground is an adequate and independent ground

6    for dismissal, a federal court will not consider the merits of the claims unless a petitioner can

7    show sufficient cause for the default and resulting prejudice, or show that a failure to consider the

8    claims would result in a fundamental miscarriage of justice.  See Thompson, 501 U.S. at 750.

9         Here, while the state appellate court indicated that petitioner forfeited his claim due to trial

10   counsel's failure to object to the prosecutor's argument, the state court also adjudicated the claim

11   on the merits.  Moreover, given the often lengthy and complicated matter of procedural default,

12   particularly an analysis of cause and prejudice, it appears that the interests of judicial economy

13   counsel in favor of reaching the merits of this claim.  See Franklin v. Johnson, 290 F.3d 1223,

14   1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex than the merits

15   issues presented by the appeal, so it may well make sense in some instances to proceed to the

16   merits if the result will be the same."), citing Lambrix v. Singletary, 520 U.S. 518, 525 (1997)

17   ("We do not mean to suggest that the procedural-bar issue must invariably be resolved first; only

18   that it ordinarily should be.")  In this case, as discussed below, petitioner's prosecutorial

19   misconduct should be denied.  Therefore, an analysis of the merits of this claim appears less

20   complicated and time-consuming than a lengthy discussion of cause and prejudice.

21        Burden of Proof

22        Petitioner relies on United States v. Hernandez, 176 F.3d 719 (3rd Cir. 1999), to support

23   his argument that reversible error occurred.  However, in Hernandez, it was the trial judge who

24   misled the jury by allowing the jury to determine reasonable doubt as to each element of a crime

25   based upon advising the jury what "you in your own heart and your own soul and your own spirit

26   and your own judgment determine is proof beyond a reasonable doubt."  Id. at 731.  The Third

27   Circuit found that this instruction allowed "jurors to convict based upon their individual 'gut

28   feeling.'"  Id.  Petitioner contends that the prosecution's argument in the instant case similarly

1   allowed jurors to convict petitioner based on a "gut feeling" rather than on a reasoned evaluation

2   as to whether the prosecution proved each element of each offense beyond a reasonable doubt,

3   and that the prosecution's subsequent comment suggesting that the jury's decision was not as

4   important as deciding who to marry further trivialized the reasonable doubt standard.

5          However, as the state Court of Appeal found, the prosecution's comments, taken in

6   context, focused on the temporal concept of "abiding conviction," rather than the basis of the

7   decision.  While petitioner emphasizes the prosecution's use of the term "feel good," the focus of

8   her comment, taken in context, was on the permanence of the verdict rather than where the

9   verdict came from.  Unlike the prosecutor in People v. Nguyen, 40 Cal.App.4th 28, 46

10  Cal.Rptr.2d 840 (1995), who equated application of the reasonable doubt standard to decisions

11  jurors make in daily life, such as changing lanes or deciding who to marry, the prosecution's

12  focus was on defining the term "abiding" as used in "abiding conviction":

13              an abiding conviction just means you feel good about the decision
              you've made.  Tomorrow when you wake up, you feel good about
14            the decision you made, you feel like you've made the right choice.

15              . . .

16              And the week after, you feel good about the decision you made, and
              the week after, and the month after, and so on and so forth. . . .
17
              The point is that it is really not so high of a standard that you can't
18            reach it.  Okay.  An abiding conviction is not, you know, it's not a
              decision like who you're going to marry.  Okay.  It -- I'm just -- I'll
19            leave you with this:  That the evidence in this case has proved
              beyond a reasonable doubt that the defendant committed these
20            crimes.

21  (RT 732-33.)  As pointed out by the state Court of Appeal, the prosecution's argument was

22  consistent with defense counsel's argument that the "decisions you make are not going to have to

23  last for a day, a week, or a month.  The decisions you make about the law and the evidence and

24  the facts in this trial is going to have to last with you for the rest of your lives."  (RT 697.)  Thus,

25  there is no reasonable likelihood that the prosecution's argument undermined or diminished the

26  burden of proof.

27          Moreover, the undersigned cannot find that the prosecution's brief comment that the

28  jury's decision is "not a decision like who you're going to marry," undermined or lowered the

                                              22

1  burden of proof.  Had the prosecution  elaborated on this statement by connecting it to decisions

2  one makes every day, as the prosecutor incorrectly did in <u>Nguyen</u>, or expressly stated that the

3  jury's decision was less important than deciding who to marry,[5] the comment might have been

4  improper.  But here, the prosecution simply distinguished the decision-making process, stating the

5  jury's decision was not like a marriage decision, without explaining how, and then stopped

6  herself, reverting to the terms "beyond a reasonable doubt" in the final statement of her rebuttal

7  argument.  The undersigned cannot find that the prosecution's brief comment was misconduct.

8         However, even assuming, *arguendo*, that the prosecution's brief comment was

9  misconduct, the undersigned cannot find that it was prejudicial.

10        In determining whether remarks rendered a trial fundamentally unfair, a court must judge

11  the remarks in the context of the entire proceeding to determine whether the argument influenced

12  the jury's decision.  <u>Boyde v. California</u>, 494 U.S. 370, 385 (1990); <u>Darden</u>, 477 U.S. at 179-82.

13  In <u>Darden</u>, the Court considered whether the prosecutor manipulated or misstated evidence,

14  whether specific rights of the accused were implicated, the context of the remarks in light of both

15  parties' arguments, the instructions given by the trial court, and the weight of the evidence.

16  <u>Darden</u>, 477 U.S. at 179-82.

17        In this case, the prosecution's challenged comments in her rebuttal argument were isolated

18  and brief.  They were made in the context of other, reasonable argument, and were overcome by

19  the trial court's instructions, as discussed below.  In addition, the defense counsel argued the need

20  to prove the case beyond a reasonable doubt.  He distinguished the reasonable doubt standard as

21  being higher than the civil standard of a preponderance of the evidence, noting that the reasonable

22  doubt standard is the highest level of proof required.  (RT 696.)  He also explained why counsel

23  can no longer argue that the jury's decision is as important as who one chooses to marry due to

24  the fifty percent divorce rate.  (ECF No. 697.)

25  ////

26  _____

27  [5]  Indeed, under <u>Nguyen</u>, the prosecution's statement was accurate -- the jury's decision in a
criminal case is not like deciding who to marry "since the decision to marry is often based on a
standard far less than reasonable doubt, as reflected in statistics indicating 33 to 60 percent of all

28  marriages end in divorce."  <u>Id.</u>, 40 Cal.App.4th at 36.

The record reflects that the jury was repeatedly instructed on reasonable doubt. The trial court instructed the jury on reasonable doubt during preliminary instructions (RT 117), and re-read the reasonable doubt instruction when instructing the jury immediately prior to closing arguments (RT 627-28). The jury was instructed on what constitutes evidence. (RT 117.) The jury was specifically admonished that nothing the attorneys say is evidence: not their remarks in opening or closing arguments, nor their questions. (RT 118.) These admonitions as to what is, and what is not, evidence, were repeated to the jury prior to closing arguments. (RT 628.)

In addition, while reviewing the elements of each crime with the jury, the trial court reiterated that the prosecution has the burden of proving each allegation beyond a reasonable doubt. (RT 639, 641, 646, 656, 658, 659, 660.) While reviewing the jury verdict forms with the jury, the trial court again reinforced proof beyond a reasonable doubt by stating "if all of you agree the People have proved beyond a reasonable doubt that the defendant is guilty of the greater crime," complete the form for guilty for that crime. (RT 661.) But if the jury could not agree "whether the People have proved beyond a reasonable doubt that the defendant is guilty of the greater crime," the trial court instructed the jury to inform the court. (RT 661.) The trial court addressed three more possible scenarios, each time noting the prosecution's burden to prove guilt beyond a reasonable doubt. (RT 661-62.) Finally, in sustaining defense counsel's first objection to the prosecution's closing argument, the trial court directed the jury's attention to the court's instructions as to the definitions of reasonable doubt and the People's burden of proof. (RT 732.)

Also, the jury did not ask any questions concerning the instruction on reasonable doubt or seek clarification of the terms "abiding conviction." (Supplemental Clerk's Transcript on Appeal 58-61.) Rather, the jury inquired as to lesser-included offenses, the definition of assault, and sought to have witness testimony re-read. (Id.) Moreover, in light of the acquittals on Count 8, dissuading a witness, and the use of a firearm enhancement on Count 7, the jury must have accorded the benefit of the doubt to petitioner by applying the reasonable doubt standard.

Finally, as found by the state Court of Appeal, the evidence against petitioner was overwhelming.

////

1   For the reasons expressed by the California Court of Appeal, any misconduct engaged in

2   by the prosecutor during rebuttal did not result in prejudice.  The "touchstone of due process

3   analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability

4   of the prosecutor."  Smith v. Phillips, 455 U.S. 209, 219 (1982).  In reviewing the prosecutor's

5   statement concerning the decision to marry in the context of the entire trial, the prosecutor's

6   statement did not deprive petitioner of a fair trial.  The state court thus reasonably concluded that

7   petitioner was not prejudiced by any misconduct.  The state court's decision was not contrary to,

8   or an unreasonable application of, clearly established federal law.  Accordingly, petitioner is not

9   entitled to federal habeas relief on this claim.

10  VI.  Conclusion

11  Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of

12  habeas corpus be denied.

13  These findings and recommendations are submitted to the United States District Judge

14  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

15  after being served with these findings and recommendations, any party may file written

16  objections with the court and serve a copy on all parties.  Such a document should be captioned

17  "Objections to Magistrate Judge's Findings and Recommendations."  If petitioner files objections,

18  he shall also address whether a certificate of appealability should issue and, if so, why and as to

19  which issues.  A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the

20  applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C.

21  § 2253(c)(3).  Any response to the objections shall be filed and served within fourteen days after

22  service of the objections.  The parties are advised that failure to file objections within the

23  specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951

24  F.2d 1153 (9th Cir. 1991).

25  Dated:  March 26, 2014

26  KENDALL J. NEWMAN
    UNITED STATES MAGISTRATE JUDGE

27

28  /hino1188.157

25